M. Greenspun et al. [1] v. Commissioner. Greenspun v. Commissioner
Docket Nos. 108229, 108230, 108231, 108232, 108233, 108234, 109436, 109437, 109438, 109439, 109440, 109441, 112644, 112645, 112646, 112647, 112648, 112649, 225, 226.
United States Tax Court
1944 Tax Ct. Memo LEXIS 289; 3 T.C.M. (CCH) 341; T.C.M. (RIA) 44122; 47-1 U.S. Tax Cas. (CCH) P9227; April 12, 1944
*289 William A. Blakley, Esq., Republic Bank Bldg., Dallas, Tex., and Hoyet A. Armstrong, Esq., for the petitioners. E. G. Sievers, Esq., for the respondent. HILL Memorandum Findings of Fact and Opinion HILL, Judge: These proceedings embrace a group of related cases, duly consolidated, and involve deficiencies in tax liability determined by respondent as follows: Deficiency in
Deficiency in
Excess-Profits
Petitioner
Docket No.
Year
Income Tax
Tax
M. Greenspun
108233
1938
$11,347.89
109441
1939
23,417.62
112644
1940
31,468.56
Rose Greenspun
108229
1938
11,347.88
109438
1939
23,417.63
112645
1940
31,468.56
Parker-Browne Co.*
108234
1938
11,527.44
$ 6,660.43
109440
1939
13,983.45
5,431.55
112646
1940
22,247.51
16,323.70
M. Greenspun Trust Number One
108231
1938
14,531.80
109439
1939
19,252.26
112649
1940
42,555.13
Iva Bell Greenspun Residuary Trust
108230
1938
404.25
109436
1939
268.23
112648
1940
1,609.27
Evelyn D. Greenspun Residuary Trust
108232
1938
428.55
109437
1939
268.22
112647
1940
1,820.74
Parker-Browne Co.The Greenspun
System
225
Respondent determined that this petitioner is
liable as a transferee for the taxes alleged to
be due from the Parker-Browne Co., set out
above.
M. Greenspun and Rose Greenspun,
Husband and Wife
226
Respondent determined that these petitioners
are liable as transferees for the taxes alleged
to be due from the Parker-Browne Co., set
out above.
*290 The principal issues involve questions of (1) whether or not certain deductions claimed by some of the petitioners are properly allowable; (2) whether or not the income of the several trusts is taxable in whole or in part to the grantors; and (3) whether or not alleged excessive compensation for services and withdrawals of earnings of the corporation by its sole stockholder are taxable as informal dividends. Some of the issues raised by the pleadings have been conceded by petitioners and others have been conceded by respondent; all such concessions will be given effect in the final settlement under Rule 50. The issues remaining for decision will be more fully set out in connection with our discussion in the opinion below. Respondent concedes on brief that M. Greenspun Trust No. 1, petitioner in Docket Nos. 108231, 109439 and 112649, was, during the taxable years, a "Nontaxable distributable *291 trust." Accordingly, no facts will be found in respect of this trust, except in so far as may be pertinent in the cases of other petitioners, and decision will be entered for the petitioner in each of these docket numbers. Findings of Fact Parker-Browne Company, Petitioner - Docket Nos. 108234, 109440, 112646. Petitioner is a Texas corporation organized July 19, 1905, with its principal office at Fort Worth. Pursuant to a resolution adopted by the stockholders, the corporation was dissolved as of the close of business at December 27, 1941, but for all purposes of these proceedings its existence was continued under Texas law for three years from such date. At date of dissolution, all of petitioner's stock was owned by Morris Greenspun, sometimes hereinafter called Greenspun. In 1910, Greenspun acquired some stock in the Parker-Browne Co., and about 1917 or 1918 acquired all of its stock, which he continued to hold until the corporation was dissolved. From about 1911 through the taxable years, petitioner corporation was engaged in the manufacture and sale of carbonic acid gas, which it distributed to its customers in steel cylinders or drums. Prior to 1918, the cylinders were *292 owned by Greenspun and others, who leased them to petitioner, on the basis of a rental of 3 cents per pound. About 1918, Greenspun acquired the interests of the other parties in the cylinder system, and sold the cylinders to petitioner. In May 1919, subsequent to the acquisition of all of petitioner's stock, Greenspun caused the corporation to enter into a contract for the resale of the cylinders to him and for the lease of the cylinders by the corporation upon a royalty or rental basis. This arrangement was authorized by petitioner's directors in a resolution adopted at a special meeting on May 20, 1919, reading as follows: "Resolved that the general manager of the Company be authorized and directed to sell to Morris Greenspun all of the steel gas drums now owned by the company in consideration of the sum of $56,968.18, to be paid by the cancellation of a certain note executed by the Company in the sum of $21,500.00 and the further execution and delivery by Morris-Greenspun of his promissory note to the Company for the remaining part of the purchase price, with such rate of interest and maturity as may be advisable in the adjustment (sic) of the general manager. "Resolved further *293 that the general manager shall enter into an agreement with Morris Greenspun effective July 1, 1919, for the rental of the gas drums owned by him on a basis of 3! per pound on all gas sold and delivered in such drums, the Parker-Browne Company to replace all drums lost and to bear all expense of the repairs and replacement of broken or lost parts." The original cost of the steel cylinders which petitioner had on hand at June 28, 1919, was $56,968.18, and the average life of such cylinders was 25 to 30 years. The total current liabilities of the corporation at January 1, 1919 amounted to $31,187.95. At December 31, 1919, its current liabilities amounted to $9,681.10, and it had total capital and surplus of $195,333.32. On May 27, 1931, Greenspun and his wife, Rose Greenspun, as parties of the first part, and O. A. Brightwell, Jr., as party of the second part, executed an indenture whereby Greenspun and his wife conveyed to Brightwell, as trustee, all of their rights and interest in and to all gas cylinders then owned by them and used by the Parker-Browne Company under a contract authorized by the directors of the company at a meeting held on May 20, 1919, together with all rentals *294 and moneys accruing under such contract from and after January 1, 1930. It was provided that such property was to be held by the trustee for the use and benefit of the grantors' three children, each beneficiary's share of the net proceeds from the operation of the property to be paid on the 31st of December of each year to his or her legal representative, trustee or guardian. It was further stated that this instrument was prepared and signed to express in detail and proper form an assignment made by Greenspun in January 1930, with the intent and purposes therein specified. The trust so created is referred to hereinafter as the Greenspun Trust No. 1. On May 27, 1931, Greenspun and his wife executed a trust agreement creating a residuary trust for their children, Evelyn D., Arthur J. and Iva Bell Greenspun. This trust was to receive for the ultimate benefit of its beneficiaries the net rentals paid to Greenspun Trust No. 1 by the Parker-Browne Co. On November 8, 1935, Greenspun and his wife, as grantors, and O. A. Brightwell, Jr., as trustee, executed an instrument wherein the parties declared it was their intention thereby to revise the M. Greenspun Trust No. 1, established May 27, *295 1931. On the same date, Greenspun and his wife executed two separate trust instruments creating the Evelyn D. Greenspun Residuary Trust and the Iva Bell Greenspun Residuary Trust. Brightwell was appointed trustee of each trust, and as such trustee was directed to receive for each trust one-half of the net rentals or royalties paid by the Parker-Brown Company to greenspun Trust No. 1. Further reference will be made hereinbelow to the provisions of the three instruments executed on November 8, 1935. Under date of January 10, 1935, O. A. Brightwell, Jr., trustee of the M. Greenspun Trust No. 1, as first party, and Parker-Browne Company, by M. Greenspun, president, as second party, executed an instrument designated "Lease and Royalty Agreement" which purported to set forth, clarify and confirm the substantial provisions of the original lease contract between M. Greenspun and the Parker-Browne Company of May 20, 1919, the latter instrument and all copies thereof having been lost but pursuant to the terms of which the corporation had been paying rental on the gas drums to the trustee of the M. Greenspun Trust No. 1 since January 1, 1930. The instrument dated January 10, 1935, specified *296 the method for computing the rentals to be paid as follows: "Second party agrees to continue to pay as rental for such steel gas drums on the basis of a minimum of one cent (1 ) per pound to a maximum of three cents (3 ) per pound on all gas sold and delivered in such drums by second party. In computing the amount to be paid, second party may in the discretion of its manager, determine such amount on the basis of the income and/or profits from the sale of such gas, observing, however, the one cent (1 ) per pound minimum, and in no event to exceed the maximum of three cents (3 ) per pound on all gas sold and delivered in such drums." The agreement further provided that the second party should continue to replace, or to pay the market value of, all steel drums lost or misplaced by second party, and whether drums so lost were to be replaced or paid for at the market cost of replacements (irrespective of depreciation or book value) was to be determined by first party, at his option, and upon his demand. Second party also agreed to maintain the steel drums in a good state of repair and to bear, at its sole expense, without deduction from rentals, the cost of repairs and replacements *297 of broken, lost, worn out or obsolete parts. The contract by its terms was to continue in force and effect for so long a period of time as the trust agreement of May 27, 1931, remained operative, unless sooner terminated by mutual agreement or by operation of law. It was further recited in the contract that the rentals theretofore paid and to be paid by second party to first party "shall be considered as compensation only and not as profits." Petitioner paid or credited to M. Greenspun Trust No. 1 as rentals or royalties for the use of the steel gas cylinders during the taxable years 1938, 1939 and 1940 the amounts of $45,960.40, $58,281.80 and $71,306.85, respectively. These amounts were claimed by petitioner as expense deductions and were disallowed by respondent. M. Greenspun Trust No. 1 claimed in its returns for the taxable years, and was allowed, deductions for depreciation on the steel cylinders in the amounts of $3,172.25, $3,392.12 and $3,692.23, respectively. The cost of the cylinder systems to Greenspun in 1919 was $56,968.18. Additions for the period from 1920 to 1940, inclusive, amounted to $107,098.99. Total depreciation on these investments through 1940 was allowed *298 by the Commissioner in the amount of $101,779.22, leaving an underpreciated cost of $62,287.95 at December 31, 1940. The rentals or royalties deducted by petitioner corporation, its net income before and after such deductions as shown by its returns, and rate of rentals or royalties for each of the taxable years were as follows: 1938
1939
1940
Net income before deduction for rentals
$69,593.56
$72,367.62
$85,607.13
Rentals deducted
45,960.40
58,281.80
71,306.85
Net income after deduction for rentals as shown
by returns
$23,633.16
$14,085.82
$14,300.28
Rate of rentals shown on books
3 3 Jan.-Sept.
1 1 Oct.-Dec.
From 1919 to 1940, inclusive, petitioner paid rentals or royalties in the total amount of $691,584.48, which constituted a return in excess of 421 percent on a total investment of $164,067.17. The annual percentage of net royalties (royalties less annual depreciation allowed) for the years 1919 to 1940, inclusive, varied from about 13 percent to 113 percent of the net cost of the cylinders. For the taxable years, the percentage of net return were as follows: Percentage
of net
Net or
royalties
underpreciated
Net
received
balance
royalties
to cost of
Year
of cost
received
cylinders
1938
$56,629.56
$42,788.15
75.55
1939
53,237.44
54,889.68
103.10
1940
62,287.95
68,353.07
109.73
*299 Petitioner corporation kept its books of account and made its income tax return on an accrual basis. It accrued on its books as expense of replacing lost cylinders in the taxable years 1938, 1939 and 1940 the amounts of $3,197.25, $1,827.16 and $1,637.60, respectively, which amounts were claimed by petitioner as deductions and disallowed by respondent. These amounts were based upon the average cost of cylinders lost, and not on depreciated cost. Petitioner corporation never replaced or paid for any lost cylinders, and no demand was ever made on it by M. Greenspun Trust No. 1 either to replace or pay for lost cylinders. The Parker-Browne Company paid to Greenspun, its president and sole stockholder, as compensation for his services in the taxable years, salaries and commissions as follows: Year
Salary
Commissions
Total
1938
$12,000
$16,411.38
$28,411.38
1939
12,000
17,010.35
29,010.35
1940
12,000
17,976.51
29,976.51
Such total amounts were claimed as expense deductions in petitioner's returns. Respondent determined that $15,000 was reasonable compensation for Greenspun's services to the corporation for each of the years involved, and disallowed all deductions *300 in excess of that amount. The gross sales of petitioner corporation, wages of employees other than Greenspun, and net income, as shown by returns for the taxable years were as follows: Wages of Employees
other than
Net
Year
Gross Sales
M. Greenspun
Income
1938
$318,607.96
$38,951.90
$23,633.16
1939
307,140.30
39,262.21
14,085.82
1940
374,469.06
39,514.68
14,300.28
During the taxable years petitioner corporation had on an average about 30 employees, including office personnel, engineers, truck drivers, and others. Greenspun devoted his time almost exclusively to selling the products of the company, and getting new customers and keeping them satisfied; he spent very little time in the office or plant. O. A. Brightwell, Jr., who was secretary-treasurer and general manager, was in charge of operations of the company. He had charge of the books and records and all fiscal affairs of the company. The sum of $15,000 constituted reasonable compensation for the personal services actually rendered by Greenspun to the Parker-Browne Company in each of the taxable years. Petitioner corporation, during the taxable years, was not a personal holding company, *301 a foreign personal holding company, or a mere holding or investment company, within the meaning of those terms as defined in the applicable revenue acts and Internal Revenue Code. The net income of petitioner for the taxable years as shown in its returns and as determined by respondent, respectively, was as follows: As shown
As shown in
Year
in returns
deficiency notices
1938
$23,633.16
$86,753.58
1939
14,085.82
89,012.93
1940
14,300.28
108,220.77
In the taxable years, petitioner's current liabilities (which consisted of all its liabilities other than capital stock and surplus) were largely obligations owing to Greenspun and the Greenspun Trusts. At the beginning of 1938, petitioner's current liabilities amounted to $99,501.52, of which $83,510.31 was owing to such trusts. At the close of 1938 current liabilities aggregated $155,980.78, of which obligations due to the trusts amounted to $140,814.74. At December 31, 1939, the total of petitioner's current liabilities was $171,671.24, which included $159,667.74 due to the Greenspun Trusts. At December 31, 1940, petitioner had current liabilities of $127,402.78, of which $96,346.13 was owing to Greenspun and the *302 Greenspun Trusts. Petitioner charged off bad debts directly to income and not to a reserve. It set up on its books of account reserves for "Doubtful Notes and Accounts" but did not charge any part of such reserves into operating expense. These reserves were used only for the purpose of making financial statements and represented mere allocations of surplus. Petitioner's surplus as shown by its books was increased during the taxable years as follows: Surplus including
Increase in Surplus
Percentage of
Reserves for
and Reserves for
Increase to
Year
Capital Stock
Doubtful Notes
Doubtful Notes
Capital
Dec. 31
Outstanding
and Accounts
and Accounts
Stock
1937
$75,000.00
$ 87,333.09
1938
75,000.00
103,181.78
$15,848.69
21.13%
1939
75,000.00
113,241.99
10,060.21
13.41%
1940
75,000.00
125,320.23
12,078.24
16.10%
Petitioner's current assets and current liabilities during the taxable years were as follows: Current Assets
Jan. 1, 1938
Dec. 31, 1938
Dec. 31, 1939
Dec. 31, 1940
Cash
$ 100.00
$ 100.00
$ 23,601.48
$ 21,526.27
Notes and Accounts Receivable
142,789.79
186,992.46
157,654.57
205,662.42
Inventories
5,316.09
10,396.35
11,415.02
10,622.34
Prepaid Insurance
2,698.78
2,341.87
2,358.07
2,548.82
M. Greenspun Account
19,578.67
36,791.67
24,099.69
Employee's Account
497.90
979.91
1,734.31
1,080.35
Deposits
476.00
476.00
376.00
Total Current Assets
$170,981.23
$238,078.26
$221,339.14
$241,816.20
Current Liabilities
Jan. 1, 1938
Dec. 31, 1938
Dec. 31, 1939
dec. 31, 1940
Bank Overdraft
$ 8,651.69
Evelyn D. Greenspun Residuary Trust
$ 26,500.00
63,434.85
$ 77,545.11
$ 5,820.99
Iva Bell Greenspun Residuary Trust
26,500.00
43,672.83
46,587.91
26,296.01
Other Payables
15,000.00
2,057.63
8,809.12
28,013.62
Taxes Accrued
539,08
4,168.83
2,770.84
3,043.03
Expenses Accrued
452.13
287.89
423.54
Liability for Lost Cylinders
30,510.31
33,707.56
35,534.72
37,172.32
M. Greenspun Account
27,056.81
Total Current Liabilities
$ 99,501.52
$155,980.78
$171,671.24
$127,402.78
Percentage of Current Assets to Current
Liabilities
171.84%
152.63%
128.93%
189.788%
*303 Petitioner's book surplus, reserves for doubtful notes and accounts, and combined surplus and surplus reserves for each of the taxable years were as follows: Reserves for
Combined Surplus
Doubtful Notes
and Surplus
Book Surplus
and Accounts
Reserves
Balances January 1, 1938
$55,333.09
$32,000.00
$ 87,333.09
Add: 1938 income
23,633.13
23,633.16
Totals
78,966.25
32,000.00
110,966.25
Deduct: Income tax for 1935 and 1938
7,784.47
7,784.47
Balance
71,181.78
32,000.00
103,181.78
Transfer from surplus to reserves
(11,000.00)
11,000.00
Balances December 31, 1938
60,181.78
43,000.00
103,181.78
Add: 1939 income
14,085.82
14,085.82
Totals
74,267.60
43,000.00
117,267.60
Deduct: Income tax
Prior years
$2,726.39
1939
1,897.01
Prior years
( 597.79)
4,025.61
4,025.61
Balance
70,241.99
43,000.00
113,241.99
Transfer from reserves to surplus
4,500.00
( 4,500.00)
Balances December 31, 1939
74,741.99
38,500.00
113,241.99
Add: 1940 income
14,300.28
14,300.28
Totals
89,042.27
38,500.00
127,542.27
Deduct: 1940 income tax
2,222.04
2,222.04
Balances
86,820.23
38,500.00
125,320.23
Transfer from surplus to reserves
( 7,500.00)
7,500.00
Balances December 31, 1940
$79,320.23
$46,000.00
$125,320.23
*304 The individual income and surtaxes assessed against Greenspun and his wife as shown by their returns for the taxable years, were as follows: Year
M. Greenspun
Rose Greenspun
Total
1938
$2,007.98
$2,007.98
$4,015.96
1939
2,250.60
2,250.59
4,501.19
1940
1,177.99
1,177.98
2,355.97
At the end of each of the years 1919 to 1940, both inclusive, petitioner had a surplus within a minimum of $55,333.09 and a maximum of $157,823.14, as shown by its books and income tax returns, and during those years it declared and paid no dividend to its sole stockholder, except in 1937, when it declared and paid a dividend of $15,000. Greenspun, sole stockholder of petitioner, and his wife, Rose Greenspun, did not report any of the undistributed earnings of the corporation in the taxable years, under the provisions of section 102 of the Revenue Act of 1938 and the Internal Revenue Code. During the taxable years petitioner permitted its gains and profits to accumulate beyond the reasonable needs of its business. During the taxable years, petitioner was availed of for the purpose of preventing the imposition of the surtax upon its sole stockholder, Greenspun, and his wife, Rose *305 Greenspun, through the medium of permitting its gains and profits to accumulate instead of being divided or distributed. Morris Greenspun, Petitioner - Docket Nos. 108233, 109441, 112644 Rose Greenspun, Petitioner - Docket Nos. 108229, 109438, 112645 By instrument dated May 27, 1931, Greenspun and his wife established Greenspun Trust No. 1 and conveyed to O. A. Brightwell, Jr., as trustee, in trust for the use and benefit of their children, all of the steel gas cylinders acquired in 1919 from the Parker-Browne Company. The provisions of this instrument are sufficiently set forth in the case of the Parker-Browne Company, petitioner, hereinabove, and need not be repeated here. On May 27, 1931, Greenspun and his wife also executed an instrument creating a residuary trust for their three children, Evelyn D., Arthur J., and Iva Bell Greenspun. G. L. Elkins was appointed residuary trustee, and was required, among other things, to receive the net proceeds from the rentals paid to Greenspun Trust No. 1 by the Parker-Browne Company. The terms of this trust were restated, modified and amended by an instrument executed at a later date, to which more detailed reference will be made below. *306 On March 30, 1933, Greenspun and his wife executed an instrument by which they appointed O. A. Brightwell, Jr., trustee of the residuary trust above mentioned, in the place of G. L. Elkins, who had resigned. On November 8, 1935, Greenspun and his wife, as grantors, and O. A. Brightwell, Jr., as trustee, executed an instrument in which the parties declared it was their intention thereby to reform Greenspun Trust No. 1 established May 27, 1931 "to correct mistakes therein and supplement the same in accordance with the true will and intention of the grantors." The instrument further recited that since the execution of the said trust, Arthur J. Greenspun, one of the children of the grantors, had died leaving Evelyn D. and Iva Bell Greenspun surviving, and further provided in part material here as follows: The grantors reaffirmed the conveyance to Brightwell, as trustee, of all gas cylinders owned by them as of May 27, 1931, together with all additions to the number of cylinders subsequent to such date, and all rentals or moneys accruing under the contract executed on or about May 20, 1919 by the grantors and Parker-Browne Company, from and after January 1, 1930. The trustee was directed *307 to hold such property in trust for the two surviving children of the grantors to the extent of an undivided one-half interest therein to each child; to sell, lease or otherwise contract for the use of the property; to receive the rentals, royalties and profits therefrom, and to pay all necessary expenses. The grantors declared it to be their intention that each of the beneficiaries named should be absolutely vested with an undivided one-half interest in the property, subject only to the limitations imposed in the trust instrument. The trustee was directed to pay on December 31 of each year to the legal representative, trustee or guardian of each beneficiary "his or her share" of the net proceeds of the operation of the property or from the sale thereof. It was provided that the trust should terminate in regard to each beneficiary when she attained the age of 30 years, at which time all of the estate therein conveyed for her benefit should be paid over to her. The trustee was granted compensation for his services in an amount to be determined by him according to the duties performed, but not to exceed "2 1/2% of all receipts and disbursements made by the" trustee thereunder. In the *308 event of death of either one or both beneficiary prior to termination of the trust, it was provided that the interest of such beneficiary should pass and be inherited according to the will of the deceased beneficiary, or if a beneficiary died intestate, then according to the laws of descent and distribution. The grantors reserved the right, at any time during the lifetimes of both of them, to remove the trustee for breach of duty, or for any reason deemed advisable to the grantors for the best interests of the beneficiaries, and to appoint a substitute trustee, such appointment to be in writing and signed and acknowledged by both grantors. On November 8, 1935, Greenspun and his wife executed a trust instrument creating a residuary trust for Evelyn D. Greenspun, with O. A. Brightwell, Jr., as trustee. The recited purposes of this instrument were to reform, correct and amend the original residuary trust instrument of May 27, 1931, under which G. L. Elkins was first appointed residuary trustee, but who was succeeded by Brightwell as such trustee under the instrument dated March 30, 1933. In the amended trust instrument, it was provided that, on or before December 31 of each year, the *309 residuary trustee should make a proper settlement and receive the net proceeds of Greenspun Trust No. 1 due the estate of Evelyn D. Greenspun, and receive and collect all further sums which might accrue to such estate, and make necessary expenditures out of such proceeds for the benefit of the beneficiary. The trustee was given specific authority to invest the proceeds of the estate; to make loans and otherwise to employ such funds within his sound discretion; to borrow on the credit of the estate and to pledge the assets as security therefor; to employ attorneys, accountants and other persons to assist in administering the estate; to pay to the beneficiary the proceeds received from Greenspun Trust No. 1, or to hold such funds and reinvest the same as therein provided; to expend out of the proceeds of the estate for the benefit of the beneficiary any sums necessary in cases of emergency, such as sickness or otherwise, together with such sums as the trustee might deem advisable for the care, support, education and maintenance of the beneficiary commensurate with her station in life. This trust instrument contained provisions similar to those contained in the instrument amending *310 Greenspun Trust No. 1, set out above, respecting the termination of the trust, compensation of the trustee, reservation of the right of the grantors to remove the trustee and appoint a substitute residuary trustee, and for disposition of the estate of the beneficiary in the event of her death prior to the termination of the trust. The trustee was further given express authority "to handle the property and proceeds" of the trust as his own business judgment might dictate, and to do any and all acts which he might deem necessary and proper, with exculpatory clause. On November 8, 1935, Greenspun and his wife also executed a residuary trust agreement for the benefit of their daughter, Iva Bell Greenspun, with Brightwell as trustee. The provisions of this instrument were in all material respects the same as those of the Evelyn D. Greenspun Residuary Trust, referred to above. On November 14, 1935, an action was instituted in the 96th District Court in and for Tarrant County, Texas, styled Morris Greenspun et ux. versus Evelyn D. Greenspun, et al., No. 12,947 A, wherein the Court was requested to ratify and confirm the terms and provisions of each of the three trust instruments dated November *311 8, 1935, mentioned above. The proceeding was heard on November 30, 1935, and on December 3, 1935, the decree of the Court was filed, granting the relief prayed for by plaintiffs. All parties to the suit were in agreement; there was no contest by the defendants, and no opposition to the decree entered. One of the primary motives of the plaintiffs in creating the trusts and in bringing the action to have them ratified as reformed was to reduce or avoid Federal income taxes. The trustee of the above mentioned trusts loaned money of the trusts to Morris Greenspun on which he paid interest and furnished collateral. Such collateral was in business enterprises in which Greenspun was interested. Some of the loans were substantial. On December 31, 1938, Greenspun borrowed $80,375.37 on a promissory note from the Iva Bell Greenspun Residuary Trust. This note was acquired by the Texusa Realty Investment Corporation in December 1939 and was cancelled in connection with the transfer to that company of certain property in Oklahoma City by Greenspun, to which transaction more detailed reference will be made below. Immediately following the purchase of this note by the Texusa Corporation, Greenspun *312 borrowed from the same trust an additional amount approximating $80,000. Greenspun paid interest at the rate of four percent on loans from the trusts, while some other borrowers paid as much as five and six percent. Prior to December 31, 1940, the two residuary trusts had jointly supplied funds for the construction of a home at Beverly Hills, California, costing in excess of $37,000 for the land, house and some furnishings. Since construction was completed, the property has been occupied as a home by Greenspun and his wife and children, and for such use Greenspun pays rent to the two trusts. At December 31, 1940, the Evelyn D. Greenspun Residuary Trust held an account receivable in the amount of $80,536.81, which represented money furnished by the trustee through Greenspun to the Ed Krist Company of Compton, California. This company was owned by Ed Krist individually, who was engaged in real estate development. The residuary trusts made numerous loans to bottling companies and individuals, many of whom were customers of the Parker-Browne Company, and the loans were made for the purpose of increasing the business of the latter company. The principal funds of the two residuary trusts *313 consisted of the rentals or royalties paid by the Parker-Browne Company, as determined by Brightwell, its manager, to Brightwell as trustee of Greenspun Trust No. 1 and distributed by Brightwell, as trustee of that trust, to Brightwell, as trustee of each of the residuary trusts. Royalties were paid or credited by the corporation at the end of each year through adjustments made on its books, or in the form of notes. Greenspun loaned money to Brightwell from time to time. From 1930 through 1940, Brightwell received a salary from the Parker-Browne Company in varying amounts. During the taxable years 1938, 1939 and 1940 his salary paid by the corporation was $3,800 per year, and he also received $50 per month from each of the residuary trusts for acting as trustee, making his total compensation $5,000 per year. Such salary constituted his sold income in the taxable years, except "a little dividend income from some stocks" that he owned, and "some money" from sales of stock. He had no rental income in the taxable years. M. Greenspun Trust No. 1 conducted no business, never received any cash and had no bank account. It was used merely as an instrumentality for distributing income to *314 the two residuary trusts through entries on the books of the Parker-Browne Company. The trustee of M. Greenspun Trust No. 1 filed a fiduciary income tax return for each of the taxable years, showing no taxable income, all net income being reported as distributed to the residuary trusts. The trustee of the residuary trusts filed returns for each, showing taxable income and tax due thereon. No part of the trust funds was ever expended for the care, support, education or maintenance of the beneficiaries. In 1938 Greenspun withdrew from the Parker-Browne Company the sum of $17,213, which was not reported by him in his income for that year. Respondent included such amount in the taxable income of Greenspun and his wife for 1938. The Parker-Browne Company did not formally declare and pay any dividend, as such, to its sole stockholder in 1938. In December 1939 Greenspun transferred certain improved real estate, located in Oklahoma City and known as the O. K. Transfer & Storage Company property, to the Texusa Realty Investment Corporation, hereinafter sometimes called Texusa Company, and Greenspun and his wife in their income tax returns each claimed as deductions one-half of a capital *315 loss of $19,573.38 alleged to have been sustained on the sale of the land and an ordinary loss of $32,720.75 alleged to have been sustained on the sale of the building and improvements. These deductions were disallowed by respondent and the amounts included in income. The cost of the property to Morris Greenspun, the depreciation allowed and the adjusted basis as reported by petitioners are not in controversy. The Texusa Company was a Texas corporation, formed for the purpose of taking title to the Oklahoma City property, above mentioned. The first meetings of the stockholders and directors of the corporation were held on December 20, 1939. O. A. Brightwell, Jr., Morris Greenspun and William A. Blakley were the sole stockholders; they were also elected directors and officers of the corporation. Brightwell was elected president, Greenspun was elected vice-president and general manager, and Blakley was elected secretary-treasurer. The capital stock consisted of 1,000 shares, of the par value of $100 per share. Greenspun contributed the entire capital of $100,000, and caused the shares to be issued as follows: To Brightwell 980 shares, to Blakley 10 shares, and to himself 10 shares. *316 Brightwell thereupon (on December 20, 1939) executed a note payable to Greenspun on or before five years from date in the principal sum of $98,000, with interest at four percent per annum, secured by 980 shares of stock in Texusa Company. On January 22, 1941, this note was credited "by cash $22,000." At the meeting of the directors on December 20, 1939, Brightwell, as president of the corporation, was authorized to purchase from Brightwell, as trustee of the Iva Bell Greenspun Residuary Trust, the promissory note dated December 31, 1938, payable to the trust and executed by Greenspun in the principal sum of $80,375.37, with a credit of $800, leaving a principal balance of $79,575.37, together with accrued interest of four percent per annum from date in the amount of $3,107.48, making the total sum $82,682.85. At the same time Greenspun offered to pay the note by transferring to the Texusa Company the Oklahoma City property hereinbefore mentioned at the price of $75,000, to be credited on the note, and the balance of $7,682.85 in cash. Brightwell, as president of the corporation, was authorized and directed to accept, and he did accept, this offer. Greenspun thereupon executed a deed, *317 dated December 20, 1939, conveying the property to the corporation, and paid the balance of $7,682.85 in cash. On the same date and immediately after the above transaction, Greenspun borrowed an additional sum of approximately $80,000.00 from the Iva Bell Greenspun Residuary Trust. Pursuant to action of the stockholders in 1941, the Texusa Company distributed its assets among them in liquidation, and in that connection, by deed dated September 30, 1941, transferred the Oklahoma City property to Brightwell at a valuation of $72,571.36. On the same date, Brightwell executed a promissory note in the amount of $78,124.67 payable to Greenspun on or before three years from date, with interest at four percent per annum, secured by a mortgage on the Oklahoma City property. The building and improvements on the property were insured against loss or damage by fire in the maximum amount of $100,000 both prior and subsequent to the transfer of the property by Greenspun to the corporation. The total fair market value of the land and building at the time of such transfer on December 20, 1939, was $150,000, the value of the building and improvements being $100,000, and the value of the land being *318 $50,000. Evelyn D. Greenspun Residuary Trust, Petitioner - Docket Nos. 108232, 109437, 112647 The facts with respect to the income of this trust, in controversy here, are sufficiently set forth in the cases of the other petitioners hereinabove. Iva Bell Greenspun Residuary Trust, Petitioner - Docket Nos. 108230, 109436, 112648 The facts in respect of this trust are, for present purposes, sufficiently set forth in the cases of the other petitioners hereinabove. Parker-Browne Company, The Greenspun System, Petitioner - Docket No. 225 M. Greenspun and Rose Greenspun, Husband and Wife, Petitioners - Docket No. 226 Upon dissolution of the Parker-Browne Company on December 27, 1941, all of its assets, subject to debts, were transferred to M. Greenspun. On August 28, 1942, all of such assets were transferred without change, except such as occurred in the ordinary operations of the business, to Parker-Browne Company. The Greenspun System, a corporation organized on that date under the laws of the State of Texas. The value of the assets so transferred was greater than the tax liability asserted by respondent against these petitioners, as transferees. Opinion Parker-Browne *319 Company, Petitioner - Docket Nos. 108234, 109440, 112646 Most of the issues submitted for decision in these proceedings, as they relate primarily to a particular case, also give rise to issues pertaining to companion cases. Such issues, therefore, will be grouped and discussed collectively rather than as single issues in each case. In the three cases of the Parker-Browne Company, petitioner, sometimes referred to herein as the corporation, the first issue stems from a transaction in 1919 between Greenspun and the corporation, but out of the same transaction other issues arise in the cases of Greenspun and his wife, and the Greenspun Trusts, described in our findings of fact above. The Parker-Browne Company was a Texas corporation organized in 1905, and, from about 1911 until it was dissolved in 1941, was engaged in the manufacture and sale of carbonic acid gas, which it distributed to its customers in steel cylinders. About 1918 Greenspun acquired all of the capital stock of the corporation and continued to be its sole stockholder throughout the taxable years 1938-1940, inclusive. On or about May 20, 1919, Greenspun entered into a written contract with his corporation whereby *320 it agreed to sell to him, at book cost, all of the steel gas cylinders then owned by it, and to rent the cylinders from Greenspun on a basis of 3 cents per pound of all gas sold and delivered therein. On May 27, 1931, Greenspun and his wife conveyed the steel cylinders to a trust known as the Greenspun Trust No. 1, for the use and benefit of the children of the grantors. On the same date the same grantors set up a residuary trust for the benefit of their children, consisting of two daughters and a son, and the trustee was directed to receive and administer for such beneficiaries the net rentals to be paid by the corporation to Trust No. 1 and by it distributed to the residuary trust. On January 10, 1935, the trustee of Greenspun Trust No. 1 entered into a written contract with the corporation whereby the corporation agreed to continue to pay to such trust as rentals on the steel gas cylinders a minimum of one cent per pound to a maximum of three cents per pound of all gas sold in the cylinders, the manager of the corporation, in his discretion, to compute within the prescribed limits the amount to be paid annually on the basis of the income or profits derived from the sale of the *321 gas. On November 8, 1935, Greenspun and his wife executed additional instruments creating two trusts, known as the Evelyn D. Greenspun Residuary Trust and the Iva Bell Greenspun Residuary Trust, for the benefit of their two daughters, the son having died prior thereto. In the taxable years 1938, 1939 and 1940, the corporation paid or credited to Greenspun Trust No. 1, as rentals for the use of the steel cylinders, the amounts of $45,960.40, $58,281.80 and $71,306.85, respectively. These amounts were computed on the basis of three cents per pound of all gas sold in 1938; three cents per pound of gas sold from January through September 1939, and one cent per pound of gas sold from October through December 1939; and one cent per pound of all gas sold in 1940. The net rentals were distributed in equal amounts by Trust No. 1 to the residuary trusts, and tax was paid thereon by the latter. Petitioner corporation claimed a deduction in its income tax return for each taxable year of the amount of rental paid in such year, and contends that it was an allowable business expense. Respondent disallowed the deductions so claimed and included the amounts in the corporation's taxable income. *322 Respondent also included the amounts in the taxable income of Greenspun and his wife, along with other income from the residuary trusts. This is the basis of the first issue in the corporation's case. In support of his action, respondent contends on brief that in the contract providing for the sale of the cylinders by the corporation to its sole stockholder and the lease agreement for their use, Greenspun was in effect dealing with himself; that the transactions were not at arm's length; that the contract had no business foundation or purpose, but was merely a tax-avoidance scheme which must be disregarded for tax purposes. Respondent further argues that the so-called rentals are properly taxable to Greenspun and his wife as corporate dividends, and concedes that they are not taxable to the residuary trusts. In the circumstances shown, we think respondent's position must be sustained. The substance of the transaction was simply this: Greenspun, the individual, entered into a contract with Greenspun, incorporated, not for any business purpose but to escape income tax liability. We can arrive at no other conclusion from a consideration of the facts. Greenspun was in full control of *323 the corporation, since he owned 100 percent of its stock, and for all practical purposes he was in effect dealing with himself. In form it was a business contract, all legal formalities being scrupulously observed; but this in fact was not so. No business purpose was served or intended to be served. Prior to May 1919, the corporation owned the steel cylinders used in, and which were essential to, the operation of its business. It was in good financial condition, and there was no necessity for selling the cylinders. The sale was certainly in nowise of advantage to it. Under the terms of the contract, the corporation agreed to pay rentals or royalties so excessive they might properly be termed unconscionable, and in an arm's length transaction could only have been exacted under distress circumstances. Greenspun purchased the cylinders from the corporation in 1919 at the book cost of $56,968.18, and during the period to the end of 1940 he and Trust No. 1 purchased additional cylinders at a cost of $107,098.99, making a total gross investment in the cylinders of $164,067.17, for the use of which cylinders the corporation paid during the same period under the contract aggregate rentals *324 of $691,584.48. This constituted a return to Greenspun and his Trust in excess of 421 percent on the investment. In the taxable years 1938, 1939 and 1940, Greenspun Trust No. 1 received net royalties (gross royalties less expenses and depreciation) equal to 75.55 percent, 103.10 percent and 109.73 percent, respectively, of the undepreciated balance of cost. Again, analyzing the transaction from another viewpoint, we find that in 1938, the corporation had a net income, before deduction of rentals, of $69,593.56, from which it deducted rentals of $45,960.40, leaving net income reported in its return of $23,633.16. In 1939 it had net income before such deduction of $72,367.62, deducted rentals of $58,281.80, leaving a reported net income of $14,085.82. In 1940 the corporation had net income of $85,607.13 before deduction of rentals, but after deducting rentals computed on the basis of profits at the minimum rate, it reported for taxation net income of only $14,300.28. The arrangement provided in the contract enabled Greenspun to withdraw from the corporation each year, as rentals, all or a very substantial portion of its net profits in excess of any amount that might be predetermined *325 by him. Furthermore, the scheme placed no material restraint on Greenspun in the use of the money, even after he transferred the cylinders to his Trust No. 1. This latter trust received the gross rentals from the corporation, and, after deducting expenses and depreciation, distributed the net rentals in equal amounts to the residuary trusts, from whom Greenspun borrowed the funds at his convenience. This feature of the situation will be discussed in more detail in connection with the other issues hereinbelow. Thus, Greenspun, who bore the ultimate burden of any tax levied upon the income of his wholly owned corporation, as definitely as if imposed on his individual income, was enabled to evade a very substantial tax liability. The corporation escaped income tax by deducting the amounts as business expense, and Greenspun escaped tax on the amounts which otherwise would have come to him as dividends. While all of the stock of the corporation involved here was owned by Greenspun, that fact in and of itself is not decisive. Because a corporation has only a single stockholder, it does not follow, for that reason alone, that transactions between them must be disregarded for tax purposes. *326 Burnet v. Commonwealth Improvement Co., 287 U.S. 415. And it is also the settled rule that a taxpayer has the right to reduce his income tax or avoid the liability altogether by any means which the law allows, and for so doing he is not subject to legal censure. See authorities cited infra. However, such a transaction to be an effective tax incident must achieve some legitimate business result. It will not be recognized for tax purposes if it is not in substance what it appears to be in form. A stockholder may not, under the guise of a business transaction, deal with his wholly owned corporation in such a manner as to accomplish indirectly what he could not do directly, in order to avoid income tax liability which either would otherwise incur. Gregory v. Helvering, 293 U.S. 465; Griffths v. Helvering, 308 U.S. 355; Higgins v. Smith, 308 U.S. 473. In Higgins v. Smith, the Court plainly indicates in its opinion that the Gregory case may be viewed as a precedent for the disregard of a transfer of assets by a corporation to its sole stockholder, *327 made not for a business purpose but solely to reduce tax liability, and further points out that transactions which do not vary control or change the flow of economic benefits are to be dismissed from consideration. For the foregoing reasons, we hold (1) that respondent did not err in disallowing the deduction claimed by petitioner corporation on account of rentals or royalties paid in the taxable years to Greenspun Trust No. 1; (2) that the corporation is entitled to deductions for depreciation on the steel cylinders in the amounts claimed by and allowed to Greenspun Trust No. 1, now conceded to be a non-taxable trust; and (3) that the amounts of net rentals reported in the income tax returns of the two residuary trusts for the taxable years should be eliminated from their taxable income. We further hold that the amounts of the gross rentals claimed as deductions by the corporation are taxable to Greenspun and his wife as informal dividends, for the reason that the devious methods employed by Greenspun to effect a transfer of the net earnings of the corporation to his two residuary trusts amounted to no more than a cutting of corners, designed to reduce tax liability. The normal *328 procedure would have been for the corporation to distribute its net earnings to Greenspun as dividends, on which he and his wife would have paid tax, and then for Greenspun and his wife to distribute the funds to the trust, if they desired to make such gifts. For discussion of the principles applicable to informal dividends, and citation of supporting authorities, see similar issue in the case of Greenspun and his wife, hereinbelow. The second issue in the cases of the petitioner corporation involves deductions claimed on account of steel cylinders lost in the taxable years. In the contract of January 10, 1935 between the trustee of Greenspun Trust No. 1 and the corporation, which purported to clarify and confirm the original agreement of 1919 between Greenspun and the corporation, it was provided that the corporation should continue to replace or pay the market value of all steel gas cylinders lost or misplaced by the corporation, and whether they were to be replaced or paid for at market or cost of replacement, irrespective of depreciation or book value, was to be determined by the trustee, and replacement or payment made upon his demand. Petitioner corporation kept its books *329 and accounts on an accrual basis, and in the taxable years accrued on its books, as liability for lost cylinders, the amounts of $3,197.25, $1,827.16 and $1,637.60, respectively, which sums were claimed as expense deductions in its returns and disallowed by respondent. The corporation never in fact replaced or paid for any lost cylinders prior to or during the taxable years, and the trustee of Greenspun Trust No. 1 never demanded payment for or replacement of lost cylinders. It is respondent's contention that the amounts so accrued on petitioner's books represent contingent liabilities computed on the basis of average cost of cylinders without reference to the liability that may be incurred if and when payment or replacement is demanded by Trust No. 1, and that the amounts, therefore, are not allowable as deductions. Since we conclude that the contract of 1919 between Greenspun and his corporation must be disregarded for tax purposes, and that the transfer of the steel cylinders and assignment of the contract to Greenspun Trust No. 1 in 1931 added nothing to the validity of the contract, it follows that the corporation had no liability, contingent or otherwise, under the reformed *330 contract of 1935 to pay Greenspun Trust No. 1 for cylinders lost in the taxable years, or to replace such cylinders for the benefit of the Trust. The accrual of a non-existent liability affords no basis for the allowance of a deduction, and for that reason respondent's action in disallowing the claimed deductions is approved. We point out in this connection that, in the view we take of the case, petitioner corporation, as owner of the cylinders, would be entitled to deduct the depreciated cost of those lost in each taxable year (depreciated cost being the measure of the quantum of the losses sustained), but the amounts claimed as accrued liability to Trust No. 1 were computed on the basis of average cost and without reference to depreciation sustained, or book value. The amounts of the deductions to which petitioner might be entitled are not shown by the record. The second issue of the corporation, above discussed, is related to an issue raised in the cases of Iva Bell Greenspun Residuary Trust and of Evelyn D. Greenspun Residuary Trust. Respondent not only disallowed the deductions claimed by the corporation on account of lost cylinders, but included the amounts in income *331 of the two residuary trusts. Greenspun Trust No. 1, as well as the residuary trusts, was on a cash basis, and respondent now concedes because of that fact no such income was received in the taxable years by Trust No. 1; hence the income could not have been distributed to and received by the residuary trusts. The amounts included on this account in the taxable income of the residuary trusts will be excluded therefrom upon recomputation of the deficiencies. The third issue in the proceedings of petitioner corporation involves the reasonableness of salaries and commissions paid to M. Greenspun in the taxable years as compensation for personal services. In each of the taxable years, the corporation paid Greenspun a salary of $12,000, and additional amounts as commissions on sales, which made total compensation for 1938 of $28,411.38, for 1939 total compensation of $29,010.35, and for 1940 total compensation of $29,976.51. Respondent determined that $15,000 per year constituted fair and reasonable compensation for Greenspun's services to the corporation, and disallowed all amounts in excess thereof on the ground that they were in fact distributions of corporate profits in lieu of dividends. *332 Section 23 (a) (1) of the Revenue Act of 1938, and Internal Revenue Code allows deductions for all ordinary and necessary business expenses, "including a reasonable allowance for salary or other compensation for personal services actually rendered." The record discloses the following summarized facts pertaining to this issue: Greenspun was the sole stockholder of the corporation, and devoted his time almost exclusively to selling the products of the company; he spent very little time in the office and plant. The operation of the corporation was conducted in all other respects by O. A. Brightwell, Jr., secretary-treasurer. Brightwell had charge of the records and fiscal affairs; borrowed and loaned money; did the buying and handled extensions of credit. During the taxable years the corporation had approximately 30 employees besides Greenspun, and the amounts paid to Greenspun as compensation for his services were only about $10,000 per year less than the aggregate of the wages and salaries paid to all such other employees, including Brightwell. The burden is upon the taxpayer to prove by competent evidence that amounts disallowed by the Commissioner are in fact fair and reasonable *333 compensation for services actually rendered. Botany Worsted Mills v. United States, 278 U.S. 282. And necessity for application of the rule is emphasized in cases where the salary was paid by a corporation to its sole stockholder. Wagegro Corporation, 38 B.T.A. 1225, 1230. The evidence before us indicates that Greenspun probably was an excellent salesman, but that fact and the others summarized above do not establish that the compensation paid to him was not excessive. It has been held that reasonable compensation for services, deductible under the statute as business expense, is only such an amount as would ordinarily be paid for like services by like enterprises in like circumstances. Wagner & Son, Inc. v. Commissioner, 93 Fed. (2d) 816. There were other companies carrying on the same kind of business in the same territory in which petitioner operated. What did they pay for similar services? What would petitioner have willingly paid to a nonstockholder for the services rendered by Greenspun, its sole stockholder? Petitioner was content to rest its case without any enlightenment on these *334 points. Respondent, however, offered the testimony of a witness who performed services for a competitor company comparable to those performed by Greenspun for his corporation, and this witness expressed the opinion that compensation of $12,000 to $15,000 per year would be reasonable for his services. Petitioner has wholly failed to meet its burden of proof, and we therefore sustain respondent's action on the third issue. The fourth issue of the corporation submitted for decision is whether or not respondent erred in holding that petitioner is subject to the tax imposed by section 102 of the Revenue Act of 1938 and Internal Revenue Code. Respondent determined a deficiency in such tax for each of the taxable years. The statute levies a surtax, at the rates therein specified, upon the net income of every corporation, other than a personal holding company or a foreign personal holding company, if such corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its stockholders through the medium of permitting earnings or profits to accumulate instead of being divided or distributed. It is further provided in the *335 statute that the fact that any corporation is a mere holding or investment company shall be prima facie evidence of a purpose to avoid surtax; and the fact that the earnings or profits are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax unless the corporation by the clear preponderance of evidence shall prove to the contrary. Respondent concedes that petitioner corporation was not (1) a personal holding company, nor (2) a foreign personal holding company, nor (3) a mere holding or investment company, and (4) that it was not "formed" for the prohibited purpose. The issue, then, is narrowed to the question of whether or not petitioner was "availed of" in the taxable years for the purpose of preventing the imposition of the surtax upon M. Greenspun, its sole stockholder. This question in its final form is whether or not petitioner's earnings and profits were permitted to accumulate in the taxable years beyond the reasonable needs of its business. The question presented is purely one of fact, and the burden is upon petitioner to prove that the accumulations of earnings or profits in the taxable years were reasonably *336 needed in the operation of its business. Chicago Stock Yards Co., 41 B.T.A. 590, 613, affirmed 318 U.S. 693. Yet petitioner has offered no evidence on this point except such facts as we may be able to glean from balance sheets attached to its returns, and similar schedules. Petitioner's argument on brief substantially is that its accumulation of earnings may not be considered unreasonable because its net accumulation from January 1, 1938 to December 31, 1940, was approximately $24,000, and during all this period its current liabilities were in excess of its current assets, except at the close of the year 1940. Whether or not the reasoning of petitioner's argument is sound, the factual statements are not established by its documentary evidence. At the beginning of 1938, the first taxable year, petitioner had current assets per books of $170,981.23 and current liabilities (which included all liabilities other than capital stock and surplus) of $99,501.52. Its current assets at that time amounted to approximately 171 percent of current liabilities. At December 31, 1940, the close of the last taxable year, petitioner had current *337 book assets of $241,816.20 and current liabilities of $127,402.78, or current assets equivalent to approximately 189 percent of current liabilities. At the close of 1938 and 1939, petitioner's current assets per books amounted to approximately 152 percent and 128 percent of current liabilities. Furthermore, petitioner's current liabilities, as shown by its books at the close of the taxable years, included the amounts of $33,707.56, $35,534.72 and $37,172.32, respectively, representing accrued liabilities for lost gas cylinders, which should be excluded from its liabilities for the reasons set out hereinabove. The elimination of such non-existent liabilities would very materially increase the excess of current assets over current liabilities. In addition to its regular surplus account, petitioner had set up on its books an account designated reserve for doubtful notes and accounts. This latter was not a true reserve but merely a segregation of surplus used only for the purpose of making financial statements. At January 1, 1938, petitioner's combined surplus accounts amounted to $87,333.09, and at December 31, 1940, such surplus amounted to $125,320.23, or an increase per books of *338 $37,987.14. While the accumulation of surplus in prior years alone is not determinative, and it is the unneeded accumulation in the taxable year which is made the incidence of tax under section 102, prior accumulations may be properly considered in determining whether the current accumulation was reasonably justified by the needs of the business. Cf. Corporate Investment Company, 40 B.T.A. 1156. The record shows that petitioner corporation borrowed large sums of money from the two residuary trusts hereinabove mentioned, which Greenspun established for the benefit of his children; also that the corporation regularly borrowed money from and loaned money to Greenspun, individually in considerable sums. These were in reality no more than inter-family transactions. At the beginning of 1938, the corporation owed only $15,991.21 to others than the residuary trusts out of total current liabilities of $99,501.52; at December 31, 1938, it owed to others than the trusts the total sum of $15,166.04 out of total current liabilities of $155,980.78. At December 31, 1940, the corporation was indebted to others in the amount of $31,056.65, and to Greenspun and the *339 two residuary trusts in the total amount of $59,173.81. At the beginning of 1938, at the close of 1938 and at the close of 1939, Greenspun was indebted to the corporation on open account in the amounts of $19,578.67, $36,791.67 and $24,099.69, respectively. But at the close of 1940 the corporation was indebted to Greenspun on the same account in the amount of $27,056.81. Reasonable needs of the business can not be said to require accumulation of current earnings by a corporation for investment in securities or to make loans to its sole stockholder, and the absence of proof that such accumulation was necessary for financing the business authorizes imposition of the tax. Helvering v. National Grocery Co., 304 U.S. 282. See also Helvering v. Chicago Stock Yards Co., 318 U.S. 693. The picture we get of the corporation's financial condition, as disclosed by the balance sheets and the figures above set out, does not justify the conclusion that its business needs reasonably required accumulation of earnings or profits in the taxable years. Nor, in particular, is reasonableness of the accumulations established by the fact that *340 the corporation borrowed amounts from the residuary trusts and from Greenspun in excess of such accumulations. It might be inferred that the accumulations of earnings were necessary if it were shown that the borrowed funds were required to carry on the normal business activities of the corporation or to finance contemplated expansion of the business, but such facts are not shown, nor is there evidence to indicate for what purpose the loans involved here were made. In each of the taxable years petitioner corporation had notes and accounts receivable in excess of the amounts borrowed, and so far as we are informed the borrowed funds may have been used to make loans to Greenspun or for other purposes not related to the corporation's business. That earnings were accumulated in the taxable years out of which substantial dividends could have been declared and paid is not disputed. Nor does petitioner deny that because of these facts, imposition of the surtax upon Greenspun, its sole stockholder, was in fact prevented. And petitioner has offered no evidence which would legally excuse its conduct in that respect. During the years from 1919 to 1940, petitioner corporation paid no dividends *341 with the exception of a dividend of $15,000 in 1937. For lack of evidence to show error, the deficiencies in the tax imposed by section 102, as determined by respondent, are approved M. Greenspun, Petitioner - Docket Nos. 108233, 109441, 112644 Rose Greenspun, Petitioner - Docket Nos. 108229, 109438, 112645 In computing the deficiencies in controversy, respondent taxed to these petitioners, M. Greenspun and Rose Greenspun, all of the net income of the Evelyn D. Greenspun Residuary Trust and of the Iva Bell Greenspun Residuary Trust. The correctness of respondent's action in this regard is the first issue submitted for decision in these cases. The principal item of income received by the two residuary trusts in the taxable year consisted of net rentals or royalties paid by the Parker-Browne Company to Greenspun Trust No. 1 and by it distributed in equal amounts to the residuary trusts. We have held hereinabove that such rentals were taxable to M. Greenspun and Rose Greenspun as corporate dividends, and were improperly reported as income in the returns of the two trusts. We will consider here, then, only whether the remainder of the income of the residuary trusts is taxable *342 to Greenspun and his wife on other grounds. Respondent contends in his brief that the income of the two trusts in question is taxable to the grantors for the reason that the trusts are not bona fide trusts but merely devices created for the purpose of reducing or avoiding Federal income taxes and must be ignored for tax purposes. Respondent further contends that, regardless of his first proposition, the income of the trusts is taxable to the grantors under the provisions of sections 22(a) and 167(a) (2) [1] of the Internal Revenue Code. We will consider first the applicability of the last cited section of the statute. The two residuary trusts were established on the same date by Greenspun and his wife, as grantors, for the benefit of their two daughters. All material provisions of the two trust *343 instruments are identical in terms. Both of the daughters were minors during the taxable years. Each trust instrument authorized the trustee, among other things, (1) "to make such necessary expenditures out of the proceeds from the said estate for the benefit of said beneficiary and her estate"; and (2) "to expend out of the proceeds of said estate for the benefit of said beneficiary any sums necessary in cases of emergency, such as sickness or otherwise; together with such sums as the residuary trustee may deem advisable for the care, support, education, and maintenance of said beneficiary commensurate with her station in life." The precise question presented here was considered by the Supreme Court, on facts not distinguishable from the instant case, in Helvering v. Stuart, 317 U.S. 154, wherein the Court said: * * * Under such a provision the possibility of the use of the income to relieve the grantor, pro tanto, of his parental obligation is sufficient to bring the entire income of these trusts for minors within the rule of attribution laid down in Douglas v. Willcuts. Accordingly, we hold that the entire income of the two residuary *344 trusts is taxable to M. and Rose Greenspun under section 167. However, since the instant proceedings were submitted the Revenue Act of 1943 was passed. Section 134 of that Act amended section 167 of the Internal Revenue Code by adding thereto subsection (c) [2]. The amendment is effective as to all taxable years subsequent to December 31, 1942, by subsection (a) of section 134 and is made retroactive conditionally to cover taxable years prior to January 1, 1943, as indicated by section 134 (b) (2) [3] to modify the rule announced in the Stuart case by limiting its application to such part of the trust income as may have been used for the support, education or maintenance of the beneficiary minors. Should the parties hereto comply with the condition upon which such retroaction depends, effect will be given under Rule 50 to such retroaction upon our holding that the entire income of the trust is taxable to the grantors under section 167, unless it should be determined that the income of the trusts is taxable to the grantors under section 22 (a). We will now consider whether it is so taxable. *345 The obvious purpose of the above cited amendment was to limit the applicable scope of section 167 as interpreted by the Supreme Court in the Stuart case. The amendment does not purport to affect the applicable scope of section 22 (a) as interpreted in Helvering v. Clifford, 309 U.S. 331, and other court cases. To hold such trust income taxable to the grantors under section 22 (a) we must find that in the creation of the residuary trusts Greenspun and wife retained rights or powers in respect of the corpus and/or income of the trusts or the management or control of the trusts that constitute them mere instrumentalities for the reallocation of income in an intimate family group without substantial economic deprivation to Greenspun and his wife. To determine whether such finding is warranted we must look to the pertinent facts disclosed in the record. The trusts were irrevocable with no reversion to the grantors. The ages of the beneficiaries were about 8 years and 1 year, respectively, in 1931, when the original trusts were created. The trust was to terminate upon the beneficiary reaching the age of 30 years or at the death of the beneficiary occurring *346 at an earlier date. Upon the termination of the trusts the corpus and all proceeds thereof were to be distributed to the beneficiaries or their legatees or heirs. The trustee of the trusts was a long-time employee of Greenspun's wholly owned corporation and all of his compensation came from that corporation and from the trusts. Plenary powers were vested in the trustee respecting the administration of the trust funds. He was given express authority to handle the property and the proceeds of the trusts as his own business judgment should dictate and to do any and all acts which he might deem necessary and proper. He was empowered to make loans and otherwise to employ such funds within his sound discretion, to borrow on the credit of the trust estate and to pledge the assets as security therefor, to pay to the beneficiary the proceeds of the trust or to hold and reinvest the same, to expend out of the proceeds of the trusts for the benefit of the beneficiary such sums as might be necessary in case of emergency such as sickness or otherwise, and also such sums as he might deem advisable for the care, support, education and maintenance of the beneficiary commensurate with her station *347 in life. The grantors reserved the right to remove the trustee for any reason deemed advisable to them for the best interests of the beneficiaries and to appoint a substitute trustee. There are no restrictions as to who might be appointed as such substitute trustee. The grantors reserved no other right or power. The loans of the trust funds were, in the main, either to Parker-Browne Company, Greenspun or the customers of Parker-Browne Company. Some of the borrowers paid five or six percent interest on such loans while Greenspun paid four percent interest thereon. In making loans to the customers of Parker-Browne Company the trustee expected that company to profit therefrom through increased volume of business with a consequent larger income to the trusts from cylinder rentals. The trustee testified that he acted independently in administering the trusts and in nowise at the dictation of Greenspun. It does not appear affirmatively that Greenspun influenced or sought to influence the course of the administration of the trusts but to believe he could not have done so would display a rare type of credulity. Had the trustee failed or refused to administer the trust in a manner approved *348 by Greenspun the latter could have promptly caused himself or some other person to be substituted as trustee to act with the same broad powers vested in the original trustee. Unquestionably the trustee could have been discharged at any time at the will of Greenspun, both from the service of Parker-Browne Company and as trustee, and thus be deprived of a lucrative employment. It can hardly be gainsaid that on the whole record there is a bristle of facts to the effect that Greenspun was an astute and successful business man and that he dominated and gave direction to all activities involving his and his family's business and financial affairs. We have no doubt that in selecting a trustee Greenspun chose a trusted employee of proven subservience. But however that may be the fact remains that M. and Rose Greenspun created two irrevocable trusts without reversion for their children and conveyed thereto the sums of money representing the cylinder rentals. While the funds of the trusts were employed largely in loans that tended to promote the interests and enterprises of Greenspun, the loans were safe and profitable business transactions for the trusts. Both the corpus and the increment *349 thereof belong indefeasibly to the beneficiaries. In creating and establishing the trusts the grantors parted with full title to and all economic interest and benefit in the funds thereof. We hold, therefore, that the trusts were valid and bona fide and that the income thereof is not taxable to M. and Rose Greenspun either under section 22 (a) as applied in Helvering v. Clifford, supra, or at all. Jones v. Norris, 122 Fed. (2d) 6. The second issue in the case of Greenspun and his wife involves the question of whether or not withdrawals of corporate earnings in 1938 in the circumstances shown constituted distributions taxable as dividends. In computing the deficiencies for 1938, respondent included in the income of Greenspun onehalf of $17,213, and one-half in the income of Greenspun's wife, with the following explanation: "Withdrawals made by you from Parker-Browne Company during 1938 considered herein as dividends and not reported on your return for 1938." The only evidence bearing directly on this issue is the testimony of M. Greenspun and of O. A. Brightwell, Jr. Greenspun testified that he knew of no dividends declared *350 by the corporation in 1938, payable to him. Brightwell testified that no dividend of $17,213 was paid to Greenspun in 1938. This testimony is immaterial and irrelevant to the issue. The fact that a dividend was not formally declared is not controlling. There is no proof that Greenspun, the sole stockholder, did not withdraw funds of the corporation in the amount alleged by respondent, for his own use without any charge therefor or obligation or intention to repay the same. In these circumstances, respondent's action in treating withdrawals as distributions taxable as dividends is approved. Ben R. Meyer, 45 B.T.A. 228, 237; George P. Marshall, 32 B.T.A. 956; C. W. Murchison, 32 B.T.A. 32; Lincoln Nat. Bank, 23 B.T.A. 1304, affirmed 63 Fed. (2d) 131; Christopher v. Burnet, 55 Fed. (2d) 527. The third issue of these petitioners, M. Greenspun and Rose Greenspun, involves deductions for losses alleged to have been sustained on the sale in 1939 of certain improved real estate located in Oklahoma City, *351 Oklahoma. In their returns for 1939 each petitioner deducted one-half of $19,573.38 as capital loss sustained on sale of the land, and one-half of $32,720.75 as ordinary loss sustained on sale of the building and improvements. The cost of the property to Greenspun, depreciation allowed and the adjusted basis, as reported by petitioners, are not in controversy. Respondent disallowed the claimed deductions on the grounds that the alleged sale was not a bona fide transaction at arm's length; that it was made only for the purpose of creating fictitious losses to reduce income taxes, and that the amounts are, therefore, not deductible under section 23 (e) (2) of the Internal Revenue Code. In our considered judgment, respondent's determination must be sustained. We need summarize here but briefly the facts, fully set out in our findings above, which lead us to this conclusion. Greenspun owned certain improved realty known as the O. K. Transfer & Storage Company property, located in Oklahoma City, which he transferred in December 1939 to the Texusa Realty Investment Corporation, a Texas corporation organized for the purpose of taking title to the property. Greenspun furnished the entire *352 capital of the corporation in the sum of $100,000, and caused the 1,000 shares of stock to be issued as follows: 980 shares in the name of O. A. Brightwell, Jr., Greenspun's employee, 10 shares in the name of William A. Blakley, Greenspun's attorney, and 10 shares in his own name. Brightwell gave his promissory note to Greenspun for $98,000, secured by 980 shares of Texusa stock, and Greenspun transferred the Oklahoma City property to Texusa for a total consideration of $75,000. The property at that time had a fair market value of $150,000. The building and improvements were insured for $100,000 against loss or damage by fire, both prior and subsequent to such transfer. Brightwell had been a trusted employee of Greenspun for many years; during the taxable years he was secretary-treasurer of Greenspun's wholly owned corporation, which was the principal source of his income. The corporation paid him an annual salary of $3,800, and the two residuary trusts established by Greenspun paid him $1,200, making his total compensation $5,000 per year. In 1941, the Texusa corporation distributed the Oklahoma property to Brightwell in liquidation, and Brightwell executed a new note to Greenspun, *353 secured by a mortgage on the property in the sum of $78,124.67 for the balance due on the alleged loan. We entertain no doubt that, as a matter of substance and reality, Greenspun at all times kept the Oklahoma property firmly within his dominion and control and retained the beneficial interest, notwithstanding the legal title was first in Texusa and later in Brightwell. The circumstances indicate, we think, that he would have encountered no difficulty in reacquiring the title at any time he might have desired to do so. No sensible businessman, such as this petitioner undoubtedly was and is, would voluntarily have sold, in a bona fide, arm's length transaction, for $75,000 an income-producing property having a fair market value of $150,000; and it is incredible that Greenspun did so. The record is strikingly bare of any facts which would indicate that the Texusa Corporation, or Brightwell, ever at any time became the beneficial owner of the property, notwithstanding Brightwell's categorical testimony that he was the beneficial owner. As we pointed out in Albert W. Finlay, 17 B.T.A. 828, 830, "We have held repeatedly that a loss must be real and actual, *354 and not merely a fiction, in order to entitle it to deductibility," and that "We must scrutinize with particular care the conditions surrounding an alleged transfer or sale of property between those who bear a confidential relationship to each other, such as members of the same family or those closely associated in business." See also Harold F. Seymour, 27 B.T.A. 403, 404; Percy C. Madeira, 36 B.T.A. 456, 459. Petitioners have the burden of proving a bona fide transaction. This, in our opinion, they have not done. We are not convinced from the evidence that the parties intended in good faith to effect a transfer of beneficial ownership, and respondent's action in denying the claimed deductions is approved. The final issue of these petitioners, submitted for decision, involves bad debt deductions. Each petitioner deducted from gross income for 1940 one-half of the aggregate sum of $41,644.41, said to represent indebtedness due from Calusa Oil Corporation in the amount of $24,738.08 and indebtedness due from Greenspun System, Inc., in the sum of $16,906.33, which became worthless in that year. Respondent disallowed the *355 deductions for lack of proof, and because of the paucity of material or relevant evidence, we have been unable to include in our findings hereinabove any facts in respect of this issue. No documentary evidence was adduced to show the amount of the alleged indebtedness, although such evidence admittedly was in existence, or how or when the indebtedness was incurred. Only two witnesses testified. Greenspun, petitioner, testified that he invested $5,000 in the Calusa Corporation; also that he loaned money to the corporation on which he was to receive five percent or six percent interest. The amounts were credited to petitioner on the books of the company in California. He paid about $24,000 on obligations of the corporation. Petitioner stated that the well went dry and that he lost about $24,000 or $30,000; he didn't know the exact amount. Petitioner's attorney advised him "there wasn't anything left," so he determined the debts were worthless and charged them off as a deduction in his return for 1940. Greenspun made no reference to the alleged indebtedness due from Greenspun System, Inc.
William A. Blakley, attorney for petitioner, testified that at Greenspun's request he went *356 to California about June 1940 to investigate certain advancements his client had made to the Calusa Company and Greenspun System, Inc. As a result of his investigation he recommended to Greenspun "that he consider as absolutely lost to the Calusa the amount of $24,738, and the Greenspun System of $16,906.33." The attorney made five trips to California between June 1940 and the end of the year. He stated there were no repayments ever made to Greenspun and the two corporations were dissolved as of June 30, 1941. In order to establish that they are entitled to the claimed bad debt deductions under section 23 (k) ( 1) of the Internal Revenue Code, as amended by section 124 of the Revenue Act of 1942, petitioners must prove (1) that there was a valid subsisting indebtedness in the aggregate amount claimed to be allowable, and (2) that the debts became worthless within the taxable year 1940. Such evidence is wholly lacking. Assuming without deciding that the testimony of petitioner and his attorney is sufficient to establish the first point, there is no hint or suggestion, much less competent proof, as to the year in which the debts actually became worthless. We can not indulge *357 in assumption to relieve petitioners of their burden of proof, and certainly we can not infer that the debts became worthless within the year 1940 because they were claimed as deductions for that year, or because petitioner's attorney concluded they were worthless at the time of his investigation in the latter part of that year. There is no showing that the advancements made by Greenspun, even if they constituted valid debts, did not become worthless prior to January 1, 1940. No evidence was offered to show the financial condition of the debtor - corporations at any time. Again, for lack of essential proof, respondent's determination is approved. Parker-Browne Company, The Greenspun System, Petitioner - Docket No. 225. M. Greenspun and Rose Greenspun, Husband and Wife, Petitioners - Docket No. 226. Respondent has determined that M. Greenspun and Rose Greenspun, husband and wife, are liable as transferees for any taxes due from the Parker-Browne Company, a dissolved corporation, and that Parker-Browne Company, The Greenspun System, a Texas corporation, is also liable for such taxes as a transferee of a transferee. Petitioners have specifically admitted all facts *358 necessary to establish the liability asserted. Accordingly, decisions will be entered in these cases for respondent based upon final redetermination of the tax liability of the dissolved corporation, Parker-Browne Company. Decisions of no deficiency will be entered in Docket Nos. 108231, 109439, and 112649. Decisions will be entered under Rule 50 in all other docket numbers. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Rose Greenspun; Parker-Browne Company; M. Greenspun Trust Number One, O. A. Brightwell, Jr., Trustee; Iva Bell Greenspun Residuary Trust, O. A. Brightwell, Jr., Trustee; Evelyn D. Greenspun Residuary Trust, O. A. Brightwell, Jr., Trustee; Parker-Browne Company, The Greenspun System; M. Greenspun and Rose Greenspun, Husband and Wife.↩
*. Respondent also determined against the Parker-Browne Co. a deficiency in declared value excess-profits tax for the year 1940 in the amount of $6,035.14, and deficiencies in section 102↩ tax for the years 1938, 1939 and 1940 in the amounts of $16,314.85, $16,925.23 and $16,867.79, respectively.
1. SEC. 167. INCOME FOR BENEFIT OF GRANTORS. (a) Where any part of the income of a trust - * * * * *
(2) may, in the discretion of the grantor of any person not having a substantial adverse interest in the disposition of such part of the income, be distributed to the grantor, * * * then such part of the income of the trust shall be included in computing the net income of the grantor.↩
2. (c) Income of a trust shall not be considered taxable to the grantor under subsection (a), or any other provision of this chapter merely because such income, in the discretion of another person, the trustee, or the grantor acting as trustee or co-trustee, may be applied or distributed for the support or maintenance of a beneficiary whom the grantor is legally obligated to support or maintain, except to the extent that such income is so applied or distributed. In cases where the amounts so applied or distributed are paid out of corpus or out of other than income for the taxable year, such amounts shall be considered paid out of income to the extent of the income of the trust for such taxable year which is not paid, credited, or to be distributed under section 162 and which is not otherwise taxable to the grantor. * * * * *↩
3. (b) Taxable Years to Which Applicable. - (2) Retroactive Effect. - The amendments made by subsection (a) shall also be applicable with respect to all taxable years to which such amendments are not made applicable under paragraph (1), in the same manner as if such amendments had been a part of the revenue laws applicable to such taxable years, but only if there are filed with the Commissioner (in accordance with regulations prescribed by him with the approval of the Secretary) at such time and by such persons as may be prescribed under such regulations, signed consents that there shall be paid, at such time as the Commissioner may prescribe, all of the taxes under Chapter 1 of the Internal Revenue Code or under the corresponding provisions of prior revenue laws which would have been paid for the taxable years concerned if such amendments had been a part of the revenue laws applicable to such taxable years.↩